

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS

## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

Honorable Weaver H. Baker
Chairman, State Board of Control
Austin, Texas

U-5439

Dear Mr. Baker:

Opinion No. O-5439

Re: Authority of superintendents
of eleemosynary and mental hospitals
of the State to utilize the labor
and services of inmates of such in-
stitutions.

You make the following request for an opinion from
this department, to-wit:

"Since the summer of 1942, because of the emergency
of war and price ceiling restrictions, the State Board of Con-
trol has encountered much difficulty in obtaining fresh meat
supplies for the approximately 21,000 wards of the State of
Texas. Our need aggregates 125,000 pounds monthly. The big
packers refuse to bid. As a consequence, we initiated a plan
of purchasing livestock on the hoof and thus far we have been
able to take care of the needs in a reasonably satisfactory
way and at a substantial saving of money to the State.

"In order to carry on the program in the most economi-
cal manner, it is incumbent on us to obtain as much feed stuff
for domestic livestock during this season as possible. The
farm lands owned by the State at the various institutions will
not produce more than 25% of the amount of feed that will be
required to take care of the needs of this livestock during a
fiscal year. At the present time, there is much feed and grain
in the vicinity of each institution that could be gathered by
employees and patients of our institutions on a basis of a
percentage of the crop to the owner and a percentage to the
institution supplying the labor, or on some other basis.

"Since the establishment of the eleemosynary system,
perhaps 50% of the actual work performed on the grounds, in
the gardens, on the farms and dairy has been done by patient
labor. All psychiatrists agree that properly supervised labor
and recreation actually benefit many patients more than any

Honorable Weaver M. Baker - page 2

other thing that can be done for them. No patient or inmate of one of our schools is ever required to perform any labor against his will, although the mental patients may not legally be able to give consent, nevertheless they do know what they are doing and enjoy the work. It is figured that 5 patients will do the work of one ordinary laborer, when they are properly cared for by the employees of the State.

"The State Board of Control would like very much to utilize, as soon as possible, and hereafter, the employees, patients and inmates of our schools, on garden and agricultural lands adjacent or near each institution for the purpose of obtaining feed for domestic livestock or food for persons in our custody on some basis of obtaining the fruits of their labor for the benefit of the institution. Will you, therefore, advise us as follows:

"(1) Would the Doctor-Superintendent of any mental hospital in Texas have the right to make an agreement with an owner of a farm or garden crop, to harvest such crop, with a share to the owner and a share to the institutions, by use of patient labor, supervised by regularly employed attendants, where in the judgment of such Doctor-Superintendent, such labor would in fact benefit such patients and further provided that such action was taken by and with the consent of the State Board of Control?

"(2) If you answer the above inquiry in the affirmative, would the same rule apply to Superintendents of our eleemosynary schools and correctional schools where the inmate population is without mental defects?

"(3) Where the Doctor-Superintendent of a mental institution was of the opinion that it would benefit patients, could such Doctor-Superintendent, by and with the consent of the Board of Control, purchase an agricultural crop adjacent, or near such institution and harvest such crop, with patient labor, properly supervised by regular attendants, when it was the opinion of such Doctor-Superintendent that such labor would prove of benefit to the patient?

"(4) If you have answered Question 3 in the affirmative, would the same rule apply to eleemosynary and correctional schools?

"If neither of the above policies can be pursued as a matter of law, do you know of any method or policy that can be utilized to effect the purposes set out in the caption of this inquiry that would not be violative of the law?

Honorable Weaver H. Baker - page 3

"In view of the fact that we need to im-
mediately begin to take action in this matter,
if such can be done, because of the fact that
many forage crops are now matured, we would ap-
preciate your early attention to these inquir-
ies."

The problem with which you are confronted is
quite an important one, and you are to be commended in
seeking to work out its solution.

Your inquiry is general -- that is, with re-
spect to the classes of institutions and not with re-
spect to any particular institution -- and our answer
will be accordingly broad.

There is involved in the consideration the
general policy of the State with respect to persons in
her custody, whether as convicts in prisons, patients in
hospitals, or inmates of our eleemosynary institutions,
with respect to the personal services of such persons.
All such persons are in the custodial care of the State
for the good of the ward and the general public as well.
Where there is a specific statute with respect to such
matter, it would of course control, but in the absence
of such statute there is necessarily implied, we think,
the right of the State to the reasonable services of such
wards, not inconsistent with or destructive of this whole-
some custodial care.

In Opinion No. 0-4727 we advised the Texas Prison
Board that with respect to convict labor the policy of the
State, as evidenced by statute, prohibits the use of convict
labor for the benefit of private persons.

In Opinion No. 0-4793 addressed to you, we advised
that there existed no authority to permit inmates of the
Gatesville State School for Boys to work for hire.

In the course of that opinion we pointed out the
reason for this policy in the following words:

"One, if not the chief concern of the law
is that juveniles committed to the Training School
shall be under the immediate supervision provided
by law -- that is, of the officers and persons
named in the statutes.

Honorable Weaver H. Baker - page 4.

"Clearly, if the inmates were hired out to farmers to assist them in gathering their crops, or in other farm work, at peak times, or otherwise, the boys would not be under the immediate supervision of the constituted authorities for such period, but, on the contrary, would be under the immediate supervision to an extent of the farmer or farmers to whom they were hired. The wards of the Institution are not chattels to be bartered, hired or loaned for the convenience of the farmers or the convenience or profit to the State. The particular work mentioned by you may well be a helpful one in a worthy cause, and of no hurt to the juveniles. But, granting the power, there would be no stopping place. Once recognized to exist, the power could be exercised in ways most damaging and hurtful to the wards."

Upon these considerations your plan contemplated in Question 1 is out of bounds. Under such a plan the ward or inmate would in legal essence be hired out and under the control of the employer, whether the compensation be in money or other kind of property.

Your second suggested plan contained in Question 3, however, does not fall within the condemnation of the policy of non-hiring out above discussed. As matter of law, we see no valid objection to the adoption of such a cash and carry plan, where such supplies are such as are authorized to be purchased by the institution generally. By this plan to purchase and harvest, or process, there is no element of hiring out the State's wards involved. On the contrary, they are at all times within the proper custodial care of the State authorities.

We think such a plan may be adopted and carried out by the authorities in control of our mental institutions, and likewise our eleemosynary and correctional schools. As a policy or practice it is not condemned by law, though, of course, like any other lawful policy or practice it might be subject to abuse. It is capable of wise use, and could result in considerable economy in these institutions.

Honorable Weaver H. Baker - page 5

It must at all times be remembered that the State's policy in the maintenance of such institutions is not one of profit to the State in any respect, but rather for the benefit of the patient or inmate, and that personal labor or service of such patient or inmate is itself a part of the correctional treatment or care, and ordinarily should be voluntarily performed by the inmate. The performance, nature and extent of such labor is such as reasonably prudent officials under such circumstances would permit, having due regard to the welfare of the patient or other inmates.

In Clough v. Worsham, 74 S. W. 350, it was specifically held that no law or public policy forbids the working of an inmate of the State Lunatic Asylum outside the grounds of the institution, the court saying:

"* * *. Appellants insist that whenever a person is found insane by a proper court, and committed to the asylum for restraint and treatment, it is negligence per se for the authorities in charge of such asylum to permit such person to leave the asylum grounds. We have carefully examined all of the statutory provisions bearing upon the subject, but we are unable to agree with this contention. It is true that, in order to admit a person as an inmate to an insane asylum, the court must find that he is of unsound mind, and that it is necessary that he should be placed under restraint, and the judgment of the court in such case is that he be conveyed to the lunatic asylum for restraint and treatment. Rev. St. 1895, arts. 133, 136. But we have found no provision of law which requires that such person must be confined within the walls or upon the grounds of such asylum. In this case it will be noted that the insane persons were not unrestrained at the time the injury occurred. If they had been permitted to leave the asylum or its grounds without any restraint whatever, a different question would be presented; but the question here presented is whether it is a violation of legal duty to permit such persons to leave the asylum premises, even under restraint. There

is no direct provision of the law to this effect, nor any provision from which such conclusion can be reasonably inferred; and, this being the case, we conclude that the Legislature only intended that such persons should be restrained, but that the character and extent of such restraint, and whether such persons should at all times be confined within the grounds of the asylum, was left to the discretion of the officials upon whom the duty devolved."

A writ of error to the judgment was refused, and this is decisive as to an insane ward. For even stronger reasons the rule is the same in respect to wards or inmates not so afflicted.

Our holding is not impelled by any consideration of war or other emergency whatsoever. Emergency can not confer official power where none otherwise exists. It only affords opportunity to exercise a power already existing.

Trusting that what we have said thus generally is sufficient to answer your questions, we are

Very truly yours

APPROVED AUG 3, 1943

ATTORNEY GENERAL OF TEXAS

By

FIRST ASSISTANT
ATTORNEY GENERAL

Ocie Speer
Assistant

By

R. O. Koch
Assistant

OS )
ROK ) MR

THIS OPINION
CONSIDERED AND
APPROVED IN
LIMITED
CONFERENCE